<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SUSAN TINIO,<br><br>                Plaintiff,<br><br>v.<br><br>SAINT JOSEPH REGIONAL MEDICAL<br>CENTER, et al.,<br><br>                Defendants. | Civil Action No. 13-829(JLL) (JAD)<br><br><br>**OPINION** |

**LINARES,** District Judge**.**

This case arises out of allegations that Plaintiff's employer, Saint Joseph Regional Medical Center ("St. Joseph's"), retaliated against her for engaging in purported whistleblowing activity. Currently before the Court is Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.  The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, Defendant's Motion for Summary Judgment is granted.

**I.      BACKGROUND**

The following relevant facts are not in dispute, except as otherwise noted.

**A.  Plaintiff's Employment at Saint Joseph Regional Medical Center**

Plaintiff began employment with St. Joseph's in June 17, 1991 as a per diem Registered Nurse ("RN") on Regan 2, the Psychiatric Unit ("Regan 2" or "the unit"). (Def. 56.1 Stmt., ¶ 1; Pl. Resp. 56.1 Stmt., ¶ 1).  Regan 2 is a twenty-four (24) bed voluntary psychiatric unit.  (*Id.*, ¶ 2). When Plaintiff worked her per diem weekend shifts, she typically worked the evening or night shift.  (*Id.*, ¶ 4).  Plaintiff worked the day shift "rarely."  (*Id.*, ¶ 5).  When Plaintiff started with St.

Joseph's she worked full-time for approximately 6 months. (*Id.*, ¶ 7).  Plaintiff then worked per diem until Defendant terminated her employment in August 2012. (*Id.*, ¶ 8).

### B. Plaintiff's Working Relationship with her Supervisor and Co-Workers

During her employment with St. Joseph's, Plaintiff received disciplinary corrective notices for violations of St. Joseph's policies.  (*Id.*, ¶ 18).  On November 17, 2009, Plaintiff received a disciplinary notice for failing to exhibit professional courtesy and respect toward another hospital staff member, and for failing to follow proper protocol in reference to conflict and problem resolution. (*Id.*, ¶ 19).  On April 11, 2010, Plaintiff received a disciplinary notice for staying past the end of her shift on April 10, 2010, without approval.  (*Id.*, ¶ 20).

In October 2010, Carline Timothee ("Ms. Timothee"), Plaintiff's former co-worker, filed an EEOC charge alleging race discrimination against the former Nurse Manager, Darlene Borromeo.  (*Id.*, ¶ 21).  After Timothee filed her EEOC charge, Defendant conducted an internal investigation into her allegations regarding Nurse Manager Borromeo.  (*Id.*, ¶ 22).  As part of the internal investigation, Linette Santos ("Ms. Santos"), Employee Relations Manager, and Defendant's legal counsel, met with the entire Regan 2 nursing staff individually, including Plaintiff, to interview them about their interactions with Nurse Manager Borromeo in the workplace. (*Id.*, ¶ 23).  On or about January 19, 2011, Ms. Timothee, Ms. Santos, and legal counsel met at the EEOC for a mediation session.  (*Id.*, ¶ 24).  Plaintiff drove Ms. Timothee and another co-worker to the EEOC office in Newark, New Jersey.  (*Id.*, ¶ 25).  Plaintiff had never seen a copy of the EEOC charge that Ms. Timothee filed.  (*Id.*, ¶ 27).  Plaintiff did not testify at the EEOC mediation.  (*Id.*, ¶ 28).  Ms. Santos saw Plaintiff in the lobby of the EEOC when she left the mediation session.  (*Id.*, ¶ 29).  Ms. Timothee settled her matter against Defendant at the mediation

in January 2011.  (*Id.*, ¶ 30).  Nurse Manager Borromeo's employment with Defendant ended following the settlement of the EEOC charge.  (*Id.*, ¶ 31).

In March 2011, David Albus ("Nurse Manager Albus") became the Nurse Manager of Regan 2.  (*Id.*, ¶ 32).  Nurse Manager Albus learned about the opening for the Nurse Manager position through the Director of Nursing, Eddie Perez ("Director Perez"), whom he had worked with previously at a hospital in Red Bank, New Jersey.  (*Id.*, ¶ 33).  Director Perez told Nurse Manager Albus that a position was opening because the Manager in place was leaving.  (*Id.*, ¶ 34).

On April 25, 2011, Nurse Manager Albus had a conversation with Plaintiff about her inability to do a procedure called the Accu-Chek, draw blood and get into Omnicell which resulted in her being unable to support staff.[1]  (*Id.*, ¶ 39).  In July 2011, Nurse Manager Albus learned that Plaintiff had an issue with Kathleen Sloan ("Ms. Sloan"), crisis counselor for psychiatric emergency wherein Plaintiff had a disagreement with Ms. Sloan during a telephone communication about the transfer of a patient.  (*Id.*, ¶ 40).  On one occasion, Nurse Thomas reported that there was an elderly patient who was agitated and; rather than calm her down, Plaintiff made her more frustrated.  (*Id.*, ¶ 47).

In December 2011, Nurse Manager Albus prepared Plaintiff's first performance evaluation as her supervisor.  (*Id.*, ¶ 59).  Nurse Manager Albus rated Plaintiff as "meeting expectations" on her performance evaluation for 2011.   (*Id.*, ¶ 60).  Nurse Manager Albus met with Plaintiff on March 12, 2012 to discuss her performance evaluation.   (*Id.*, ¶ 61).  When Plaintiff arrived at Nurse Manager Albus' office, he noticed that she appeared upset.   (*Id.*, ¶ 62).  During their

---

[1]  This paragraph in Defendant's 56.1 Statement indicates that it was April 15, 2011, which is clearly a clerical error, as the exhibit referred to states April 25, as does elsewhere in Defendant's 56.1 Statement.

conversation, Plaintiff complained about the lack of a Patient Care Associate ("PCA") on the unit. (*Id.*, ¶ 65).  A PCA generally handles the custodial and ministerial functions on a unit.  Initially, Plaintiff refused to sign the evaluation because she felt that it was unfair and that she should have had higher scores.  (*Id.*, ¶ 66).  However, Plaintiff admitted that the evaluation was a good evaluation and an accurate assessment of her performance.   (*Id.*, ¶ 67).

### C.  Plaintiff's Complaints About the Working Environment on Regan 2

Plaintiff called Director Perez on one occasion to complain about user IDs for dispensing medication.  (*Id.*, ¶ 68).  Shortly after Nurse Manager Albus began his tenure, "everyone [the nurses] on the staff" complained about the lack of a PCA on the unit.  (*Id.*, ¶ 71).  Plaintiff complained to Nurse Manager Albus about the lack of a PCA on the unit on several occasions. (*Id.*, ¶ 72).  As Plaintiff explained, the PCAs would generally do, "blood work, the finger stick and rounds while the nurses performed their real function as to the group patient education, administration, admission, discharge and everything else."  (*Id.*, ¶ 73).  During her meeting with Nurse Manager Albus on March 12, 2012, Plaintiff expressed her concern about the lack of a PCA on the unit.  (*Id.*, ¶ 74).

Nurse Manager Albus considered the issue to be a "universal issue" among the staff.  (*Id.*, ¶ 76).  Nurse Manager Albus spoke with Director Perez about the PCA issue raised by "everyone on the staff."  (*Id.*, ¶ 77).  Nurse Manager Albus asked Director Perez whether the nursing model could be changed to have PCAs on the unit.  (*Id.*, ¶ 78).  Nurse Manager Albus explained that, "[t]he traditional model for psychiatric units is to have nurses and psyche techs [PCAs] on the floor with the nurses doing the medication, documentation and the psyche techs doing the meals, clothing, the daily care of the patient on the floor."  (*Id.*, ¶ 79).  Nurse Manager Albus did not have any prior experience with the all RN model.   (*Id.*, ¶ 80).   After speaking with Director Perez,

4

Case 2:13-cv-00829-JLL-JAD   Document 39   Filed 04/06/15   Page 5 of 25 PageID: 816

Nurse Manager Albus learned that the decision for Regan 2 to be a "nurses only" unit was intended to enhance the care on the unit.  (*Id.*, ¶ 81).[2]  Director Perez explained that the all RN model costs St. Joseph's more than the model with the PCAs.  (*Id.*, ¶ 83).  To change to the all RN model to one with a PCA, the nursing staff would need to be reduced – for every PCA received, one nursing position would need to be eliminated.  (*Id.*, ¶ 85).  According to Nurse Manager Albus, "it would not be an increase in staffing, it would be a change in the composition of the staff."  (*Id.*, ¶ 86). Even after Nurse Manager Albus told the staff that the PCA issue was a "closed issue," the staff continued to complain.  (*Id.*, ¶ 89).  The nursing administration commonly heard that nurses felt understaffed.  (*Id.*, ¶ 90).  Plaintiff admitted that her concerns were about what she believed to be understaffing on the unit.  (*Id.*, ¶ 91).

### D.  The July 10, 2012 Incidents Giving Rise to Plaintiff's Termination

Plaintiff worked the day shift on July 10, 2012.  (*Id.*, ¶ 92). Dr. LaPorta, the head of the psychiatric unit, was also working that shift.  (*Id.*, ¶ 93).  This is where Plaintiff's and Defendant's

---

[2]  Although Plaintiff indicates "Admitted in part and denied in part" with paragraph 81 of Defendant's 56.1 Statement of Undisputed Material Facts, Local Civil Rule 56.1 provides in pertinent part as follows:  "The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, **if not agreed, stating each material fact in dispute and citing to the affidavits and other documents** submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."  (emphasis added).  In support of Plaintiff's "admitted in part and denied in part" with paragraph 81, Plaintiff states "Plaintiff admits that the change to an all-nurse model occurred under Nurse Manager Borromeo.  However, plaintiff denies that the change resulted in enhancement of care on the unit.  In contrast, even Nurse Albus acknowledged that this model created challenges for nurses.  Plaintiff contends that the model is unsafe for patient care."  But Plaintiff's responsive statement does not cite to evidence in the record in support of same, as required by Local Civil Rule 56.1.  Instead, Plaintiff cites to her own 68 paragraph Statement of Other Material Facts.  This clearly does not comply with Fed. R. Civ. P. 56.

version of events differ.  A patient required a dose of her medication at 8:00 a.m.  (*Id.*, ¶ 94).  As of 10:30 a.m., she had not received the medication.  (*Id.*, ¶ 95).  Defendant states that when Nurse Manager Albus asked Plaintiff why the patient had not yet received the medication, she told him that she was going to be giving the medication to the patient.  (*Id.*, ¶ 96).  Plaintiff did not provide any reason why the patient was not given her medication at 8:00 a.m., the time that she was required to receive it.  (*Id.*, ¶ 97).  Plaintiff's version of events is as follows:  On July 10, 2012, Plaintiff arrived at work at 8:30 a.m.  (Pl.'s Statement of Other Material Facts, ¶ 32).  She asked Ms. Gloria Farina to give her the report, but she did not.  (*Id.*).  Plaintiff proceeded to the medication room to begin preparing her medications.  (*Id.*).  Plaintiff proceeded to administer an antihypertensive medication to a patient.  (*Id.*, ¶ 33).  The patient, who was scheduled to be discharged, was being argumentative and wanted to leave.  (*Id.*, ¶ 34).  Plaintiff explained to the patient that she needed her medication in light of her elevated blood pressure. (*Id.*).  Plaintiff never shouted at the patient.  (*Id.*).  Plaintiff contends that Nurse Manager Albus acted inappropriately by raising his voice and accusing Plaintiff of yelling at the patient.  (*Id.*, ¶ 36).  Mr. Albus intruded on Plaintiff's personal space.  (*Id.*).  While the patient raised her voice, Plaintiff never raised hers. Plaintiff was not condescending or abusive to the patient.  (*Id.*).

That same day, another patient had a chronic illness and required a lidocaine patch for pain relief.  (Def. 56.1 Stmt., ¶ 98).  The patient was in a motorized wheelchair and approached the nurse's station very upset because Plaintiff had taken off the pain patch and refused to replace it. (*Id.*, ¶ 99).  The pain patch requires nurses to check it every eight hours to ensure that it is intact – that it was not coming off, that it was not wet and that nothing was wrong with it.  (*Id.*, ¶ 100). Plaintiff removed the pain patch and told Nurse Manager Albus that he should write up all nurses who did not change the patch every eight hours.  (*Id.*, ¶ 101).  Nurse Manager Albus told Plaintiff

that the patch was not to have come off, that she was mistaken in believing that the patch was to be replaced every eight hours, and that she needed to put the patch back on the patient. (*Id.*, ¶ 102). Plaintiff incorrectly read the Pyxis, the medication dispensing system, and mistakenly thought that she was required to take the patch off the patient. (*Id.*, ¶ 103). Nurse Manager Albus went with Plaintiff to the medication room where he tried to show Plaintiff her error in reading the Pyxis and explained to Plaintiff that the patient should not be without a patch because of her chronic pain. (*Id.*, ¶ 104). When Nurse Manager Albus returned from meetings three or four hours later, the patch had still not been replaced. (*Id.*, ¶ 106). Nurse Manager Albus asked Plaintiff why the patch had not been replaced and she screamed at him: "You're micromanaging me. You're always in my business. Get away from me. You're harassing me." (*Id.*, ¶ 107). Nurse Manager Albus asked Plaintiff to lower her voice but she continued to scream, said she would "never work days again. And she stormed out the other door." (*Id.*, ¶ 108). Nurse Manager Albus told Plaintiff that if she did not replace the patch, her conduct would be considered insubordination. (*Id.*, ¶ 109). Plaintiff was hysterical during the exchange with Nurse Manager Albus. (*Id.*, ¶ 110). The patient was one of Dr. LaPorta's patients. (*Id.*, ¶ 111). When Dr. LaPorta spoke to the patient, "she was in a great deal of distress, she was very upset." (*Id.*, ¶ 113). The patient told Dr. LaPorta that the nurse who had dealt with her, "had been very short with her, had not treated her well." (*Id.*, ¶ 114). When Dr. LaPorta checked the board to see which nurse was caring for the patient, it was Plaintiff. (*Id.*, ¶ 115). At around 10:00 a.m. or 10:30 a.m., Dr. LaPorta spoke with Plaintiff at the nurses' station and Plaintiff argued with her about the "appropriateness of the order and became very insistent that she was correct." (*Id.*, ¶ 116). Plaintiff picked up the phone and called the pharmacy to verify that she was right and Dr. LaPorta was wrong. (*Id.*, ¶ 117). Plaintiff continued to be "insistent" that she was right and that the patch did not need to be administered again. (*Id.*, ¶ 119).

7

Dr. LaPorta rewrote the order and asked Plaintiff to reapply it.  (*Id.*, ¶ 120).  Plaintiff did not follow Dr. LaPorta's orders to reapply the patch.  (*Id.*, ¶ 121).  Ultimately, one of Plaintiff's co-workers replaced the patch.  (*Id.*, ¶ 122).  Dr. LaPorta left the nurses' station to take care of other patients and the social worker told her that Plaintiff attempted to walk off the floor and leave.  (*Id.*, ¶ 123).

Plaintiff's version differs.  A patient removed a pain medication patch that was not to be removed.  (Pl.'s Statement of Other Material Facts, ¶ 38).  Plaintiff had not removed it and knew that you only replace the patch every three days.  (*Id.*).  Plaintiff became aware that the patch had fallen off because the patient was holding it and told her that it needed to be replaced.  (*Id.*).  Plaintiff initially attempted to call Dr. LaPorta to have the pain patch replaced.  (*Id.*, ¶ 39).  When she could not reach Dr. LaPorta, Plaintiff asked the charge nurse to call Dr. LaPorta to order the replacement.  (*Id.*).  In the medication room, Nurse Manager Albus confronted her about the patch and accused her of taking it off.  Plaintiff advised that the patient removed it herself and demanded that it be changed. (*Id.,* ¶ 40).  Plaintiff told him that she was waiting for Dr. LaPorta's order. (*Id.*).  Nurse Manager Albus again yelled at her.  (*Id.*).  After the confrontation, Charge Nurse Farina reported that Dr. LaPorta provided the order for the patch.  (*Id.*, ¶ 42).  Plaintiff put the patch on the patient.  (*Id.*).  At absolutely no time did Plaintiff disagree or resist a directive from Nurse Manager Albus to replace the patch.  (*Id.*, ¶ 43).  Dr. LaPorta never expressed that Plaintiff was wrong in her approach.  (*Id.*).  There was never a disagreement between Dr. LaPorta and Plaintiff on the subject. (*Id.*).

Plaintiff at no time states that they had discussed the EEOC Charge or the lack of PCA's on the unit during these confrontations on July 10, 2012.  Rather, these confrontations that led to Plaintiff's termination were completely limited to whether pain medication had been properly administered.

### E.  St. Joseph's Terminates Plaintiff's Employment

Plaintiff was scheduled to work on July 28 and 29.  (*Id.*, ¶ 124).  After the July 10, 2012 incidents, Plaintiff's name was taken off the calendar for these shifts because Nurse Manager Albus wanted to speak with her about the incident.  (*Id.*, ¶ 125).  This was the only time that Plaintiff was ever cancelled from a shift since Nurse Manager Albus became her supervisor. (*Id.*, ¶ 126).  When Plaintiff was supervised by Nurse Manager Borromeo, there were occasions in which she was cancelled from shifts where she was previously scheduled to work.  (*Id.*, ¶ 127). Shortly after the July 10, 2012 incidents, Nurse Manager Albus contacted Ms. Santos to discuss Plaintiff's conduct.  (*Id.*, ¶ 130).

Ms. Santos' recommendation to terminate Plaintiff's employment was accepted by Nicole Moody, Director Recruitment/Retention & Employee Relations and John Bruno, VP Human Resources.  (*Id.*, ¶ 135).  On July 16, 2012, Nurse Manager Albus e-mailed Plaintiff requesting to meet with her and asking her to advise him of her availability to come into the hospital to meet with him.  (*Id.*, ¶ 137). On July 23, 2012, Nurse Manager Albus e-mailed Plaintiff about her signing up to work.  (*Id.*, ¶ 138).  In his e-mail, Nurse Manager Albus told Plaintiff that she was not permitted to work until they met and again requested that she contact him to schedule a meeting. (*Id.*, ¶ 139).   Two days later, Nurse Manager Albus e-mailed Plaintiff again requesting that she call or e-mail to arrange a time for them to meet.  (*Id.*, ¶ 140).  On July 20, 2012, Nurse Manager Albus mailed Plaintiff a letter stating that he made "repeated attempts" to contact her and that if she fails to respond to his letter by August 6, 2012, "it will be assumed [she] has resigned voluntarily." (*Id.*, ¶ 141).  Nurse Manager Albus scheduled a meeting with Plaintiff for August 6, 2012 to discuss the incidents that took place on July 10, 2012.  (*Id.*, ¶ 142).  That day, August 6, 2012, Plaintiff called Nurse Manager Albus to reschedule the meeting.  (*Id.*, ¶ 143).  Nurse

Manager Albus asked Plaintiff why she could not make the meeting and when would be a convenient time for her to come for the meeting. (*Id.*, ¶ 144). Plaintiff told Nurse Manager Albus that she was not feeling well and would have to get back to him with a time. (*Id.*, ¶ 145). By way of letter dated August 6, 2012, Plaintiff was advised that her employment with Defendant was terminated. (*Id.*, ¶ 146). The termination document references each of the occasions on which he spoke with Plaintiff about her work performance issues: April 25, 2011, January 6, 2012, March 12, 2012 and July 10, 2012. (*Id.*, ¶ 147). After Plaintiff's employment was terminated, she called Director Perez to ask him if he knew what happened. (*Id.*, ¶ 148). Director Perez referred her to Human Resources. (*Id.*, ¶ 149). Plaintiff went to St. Joseph's Human Resources Department and spoke with the receptionist. (*Id.*, ¶ 150). Plaintiff gave the receptionist a letter she had written to Ms. Moody. (*Id.*, ¶ 151).

In light of the foregoing, Plaintiff commenced the instant cause of action on February 9, 2013. This Court's jurisdiction over Count One (Plaintiff's Title VII claim) is premised on federal question, 28 U.S.C. § 1331. This Court's jurisdiction over the remaining state law claims is premised on supplemental jurisdiction, 28 U.S.C. 1367(a). The Complaint, contains the following three claims: (1) a violation of Title VII of the Civil Rights Act of 1964; (2) a violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.*; and (3) a violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, *et seq.* Defendant now moves for Summary Judgment on all of Plaintiff's claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists no "genuine dispute as to any material fact" and the movant is entitled

to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  *See Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  If a reasonable juror could return a verdict for the non-moving party regarding material disputed factual issues, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 242-43 ("At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III.   DISCUSSION

As stated above, Plaintiff's Complaint contains the following claims:  (1) violation of Title VII of the Civil Rights Act of 1964; (2) violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.*; and (3) violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, *et seq.*

### A.    Plaintiff's Claim for Retaliation under Title VII or NJLAD

Title VII of the Civil Rights Act of 1964 and the New Jersey Law Against Discrimination ("NJLAD") both protect employees who engage in protected activity from retaliation by their employers.  Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3. The NJLAD provides, that it is unlawful:

> For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.

N.J.S.A. 10:5-12d.

To advance a *prima facie* case of retaliation under Title VII and the NJLAD, a plaintiff must show that: (1) the employee engaged in a protected employee activity known by the employer; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (involving claim for retaliation based on Title VII); *Delli Santi v. CAN Insurance Companies*, 88 F.3d 192, 198 (3d Cir. 1996) (plaintiff brought retaliation claim under NJLAD). If the plaintiff establishes this *prima facie* case of unlawful retaliation, the burden then shifts to defendant to articulate some legitimate, non-retaliatory reason for the adverse employment action. *Moore v. Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). The burden then shifts back to plaintiff to persuade the factfinder that defendant's proffered reason was pretext. *Id.* Accordingly, to defeat Defendant's motion for summary judgment, Plaintiff must produce evidence that a reasonable jury could use to reach this conclusion. *Id.*

The crux of Defendant's arguments in support of summary judgment as to Plaintiff's Title VII and NJLAD claims is that the evidence adduced in this case fails to suggest either that Plaintiff engaged in protected activity or that there was a causal link between Plaintiff's purported activity

and the termination of her employment.  Plaintiff, on the other hand, argues that she did engage in protected activity by participating in the investigation surrounding Ms. Timothee's charge of discrimination and by accompanying Ms. Timothee to the EEOC offices.[3]

Plaintiff has not adduced evidence to demonstrate that she engaged in a protected activity known by the employer.  She argues that Defendant perceived her as providing assistance to Ms. Timothee.  Plaintiff mischaracterizes Ms. Santos's testimony, claiming that "Ms. Santos admitted that she assumed that Ms. Tinio was there to support Ms. Timothee."  (Pl. Opp'n Br. 8, Pl. Statement of Facts, ¶ 10).  When in reality, Ms. Santos stated that she did not know why Miss Tinio was at the EEOC offices that day and did not think about whether she was there because of the Timothee proceeding.  (Def. Reply at 7, Santos Dep. Tr. at 31-33).  There is no other evidence in the record to demonstrate that Plaintiff provided any assistance to Ms. Timothee.  Even if she had, there is no evidence for a reasonable jury to conclude that Nurse Manager Albus knew about this activity.  Nurse Manager Albus was not employed by St. Joseph's at the time of the EEOC hearing.  (Def. 56.1 Stmt., ¶¶ 32-36).

---

[3]  In support of her opposition to the motion for summary judgment on her NJLAD and Title VII retaliation claims, Plaintiff relies solely on assistance to Ms. Timothee as the protected act.  With respect to her claim brought under CEPA, Plaintiff relies simply on her complaints regarding the lack of a PCA as her whistleblowing activity.  As Plaintiff does not press the lack of a PCA issue with respect to her Title VII and NJLAD claims and does not press the assistance to Ms. Timothee as part of her CEPA claim, the Court will consider Plaintiff as having abandoned these arguments.  *See Curtis v. Treloar*, No. 96–1239, 1998 WL 1110448 (D.N.J. Aug. 27, 1998) *aff'd*, 189 F.3d 463 (3d Cir. 1999) ( "plaintiffs appear to have abandoned that claim, as they have failed to offer any argument or evidence on that claim in opposition to defendants' motion for summary judgment.") (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.")).  Accordingly, the Court will consider only the assistance to Ms. Timothee with respect to the NJLAD and Title VII claims and the complaints regarding the lack of a CPA for the CEPA claim.

Even if this Court were to assume that any assistance Plaintiff may have provided to Ms. Timothee amounted to Plaintiff engaging in a protected activity, it is apparent that the facts to which Plaintiff points are insufficient to raise a triable question as to whether there is a causal link between her assisting Ms. Timothee and the termination of her employment.  Plaintiff argues that the following facts suffice to raise genuine questions of material fact as to whether there is a causal link between assisting Ms. Timothee and termination of her employment:  (1) the timing between engaging in the protected activity and termination; and (2)  evidence of ongoing antagonism.[4]

Although the Court does not dispute that the timing of an employee's termination may be suggestive of retaliation when accounting for the totality of the facts in the record, the temporal proximity between a protected act and a termination of employment is not, alone, *prima facie* evidence of retaliation.  *See*, *e.g.*, *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 301 (3d Cir. 1991); *see also Young v. Hobart West Grp.*, 385 N.J.Super. 448, 467 (App.Div. 2005) ("[T]he mere fact that [an] adverse employment action occurs after [the protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two.").  This is particularly so in this case, since there was an unprotected intervening act between Plaintiff assisting Ms. Timothee and her termination, namely, Plaintiff's insubordination.  *See*, *e.g.*, *Reap v. Cont'l Cas. Co.*, No. 99–1239, 2002 WL 1498679, at *20 (D.N.J. June 28, 2002) ("Even if a causal connection is assumed, however, intervening unprotected conduct may sever the putative causal connection between protected activity and an adverse action.").

The undisputed facts in this case indicate that Ms. Timothee filed her EEOC charge in October 2010 and that it settled in January 2011.  (Def. 56.1 Stmt., ¶¶ 21-30).  Plaintiff's

---

[4] Plaintiff points to not a single piece of evidence in support of this conclusory allegation that there was ongoing antagonism.

termination occurred almost two (2) years after the October 2010 charge.  (*Id.*).  On these facts, Plaintiff cannot establish the necessary causal link required to set forth a *prima facie* case of retaliation because any assistance rendered to Ms. Timothee in support of her EEOC charge is too attenuated from the termination of her employment.  *See Levins v. Braccia*, 2009 N.J. Super. Unpub. LEXIS 1473, *20 (App. Div. June 16, 2009) (Panzini Cert., Exhibit K) (not "unusually suggestive" of retaliation where termination occurred four (4) months after complaint); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (without more, a three (3) month gap between adverse employment action and protected activity is insufficient to give rise to an inference of causation); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (five (5) month gap also insufficient).  Accordingly, Plaintiff has failed to make a sufficient showing with respect to an element of her *prima facie* case.

St. Joseph's argues that it had a legitimate non-retaliatory reason for terminating Plaintiff, to wit, her insubordination, failure to follow her manager's directive and she yelled at a patient. (Def. 56.1 Stmt., ¶ 133).  Defendant has met its burden to provide a legitimate non-retaliatory reason for Plaintiff's termination.

When faced with a legitimate, non-retaliatory reason for Defendant's actions, the burden of proof rests with Plaintiff to show that the proffered reasons are pretextual.  *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 455 (3d Cir. 2006).  Plaintiff may survive summary judgment by submitting evidence that "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination [or retaliation] was more likely than not a motivating or determinative cause of the adverse employment action."  *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994).  "To discredit the employer's proffered reason, however, the plaintiff

15

cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  *Id.* at 765.  "[F]ederal courts are not arbitral boards ruling on the strength of 'cause' for discharge.  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination or retaliation]."  *Keller*, 130 F.3d at 1109 (citing *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)).  Plaintiff "must show, not merely that [Defendant's] proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."  *Fichter v. AMG Res. Corp.*, 528 F. App'x 225, 230 (3d Cir. 2013).

Plaintiff states in conclusory fashion, and without any factual support, that Defendant's proffered reason for her termination is pretextual.  Plaintiff specifically argues: (1) that her disciplinary history was considered in St. Joseph's termination decision because St. Joseph's included an overview of her disciplinary history in its Statement of Undisputed Material Facts; (2) Plaintiff argues that after written discovery and during their depositions, St. Joseph's employees changed their positions as to the reason for Plaintiff's termination; and (3) Defendant has asserted inconsistent positions regarding the decision-maker for Plaintiff's termination. (Pl's Opp'n Br. at 10-12).

With respect to Plaintiff's disciplinary history, there is no question that Ms. Santos explained that Plaintiff was not terminated based on past performance issues, and Plaintiff concedes such.  (Pl. Opp'n Br. at 11).  Plaintiff also argues that Defendant has changed its reason for termination multiple times, demonstrating pretext.  (*Id.*).  But Defendant has consistently stated that Plaintiff's termination was for insubordination.  With respect to who was the decision-maker for the termination, even if Defendant's witnesses in interrogatories and depositions painstakingly

16

clarified the steps taken to effect Plaintiff's termination, Defendant has consistently stated that Plaintiff was terminated by Ms. Santos and approved by Human Resources —any perceived "inconsistency" by Plaintiff is not sufficient to overcome Defendant's non-retaliatory reason for Plaintiff's termination. *See Butler v. Cooper-Standard Auto., Inc.*, 498 F. App'x 549, 553 (6th Cir. 2012); *see also Clair v. Agusta Aerospace Corp.*, 592 F. Supp. 2d 812, 820-21 (E.D. Pa. 2009) ("[P]ointing to a single inconsistency does not automatically overcome a legitimate, non-discriminatory reason for termination.").

There is no competent record evidence from which a reasonable jury could find that Plaintiff was terminated for any reason other than her actions on July 10, 2012 or that the stated reason for her termination was not the real reason for her termination.  Further, Plaintiff's refusal to contact Nurse Manager Albus after his repeated attempts to reach her to discuss the July 10, 2012 incidents, demonstrate that Plaintiff was aware that her conduct on that date was inappropriate.

In light of Plaintiff's failure to establish a causal link between driving Ms. Timothee to her EEOC hearing and her termination or pretext, the Court will grant summary judgment on Plaintiff's Title VII and NJLAD claims.

**B.    CEPA Claims**

Count Three of the Complaint alleges a violation of CEPA.  The crux of Plaintiff's CEPA claim is that Plaintiff was retaliated against by Defendant because she complained about the lack of PCAs on Regan 2.  As such, Count Three is premised on the CEPA provision barring retaliatory action against an employee who objects to an employer's activity, policy, or practice that the employee reasonably believes to be "incompatible with a clear mandate of public policy concerning the public health." N.J.S.A. 34:19-3(c)(3).

New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A. § 34:19–1, *et seq.*, was enacted to protect employees who report illegal or unethical actions in the workplace, and also to encourage such reporting. *Fleming v. Corr. Healthcare Solutions, Inc*., 164 N.J. 90, 96 (2000). New Jersey courts apply the familiar *McDonnell–Douglas* burden-shifting framework in evaluating claims under the statute. In order to state a *prima facie* retaliation case under CEPA, a plaintiff must prove by a preponderance of the evidence that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a whistleblowing activity described in N.J.S.A. § 34:19–3c; (3) an adverse employment action was taken against him or her; *and* (4) a causal connection exists between the whistleblowing activity and the adverse employment action. *Massarano v. New Jersey Transit*, 948 A.2d 653, 662 (N.J. Super. App. Div. 2008) (quotation omitted). The burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for taking the employment action, after which it is the employee's burden to demonstrate pretext by a preponderance of the evidence. *See generally Klein v. Univ. of Med. and Dentistry*, 377 N.J. Super. 28 (App. Div 2005).

As stated above, Plaintiff alleges the following whistleblowing activities allegedly protected by the New Jersey Conscientious Employee Protection Act, N.J.S.A. § 34:19-1, *et seq.* ("CEPA"):

> a. "At or around the time of her appraisal, Ms. Tinio expressed concern to Mr. Albus that only registered nurses and not full-time nursing assistants were working in the psychiatric unit and that nurses that nurses were complaining of being overwhelmed by having to perform so many different tasks. For instance, the lack of a unit clerk resulted in registered nurses having to do paperwork that took them away from patient care responsibilities. She complained that the quality of care was suffering as a result."          (Complaint, ¶ 15.)

18

b.    "Ms. Tinio expressed her concerns to Mr. Albus that the understaffing and overworking of nurses was negatively impacting patient care and staff safety.    For instance, the understaffing/overworking situation resulted in patients in the psychiatric unit escaping/eloping from the unit." (Complaint, ¶ 16.)

Plaintiff alleges that she was subjected to the following retaliatory actions because of her allegedly protected conduct:

(1)    She was yelled at in a threatening manner,

(2)    Her hours were reduced and became very sporadic,

(3)    The Nurse Manager began micromanaging her and began a pattern of harassment when she was on the schedule,

(4)    The Nurse Manager repeatedly raised his voice when addressing her and made false accusations about her job performance.

(5)    Plaintiff was removed from the schedule during one weekend,

(6)    Plaintiff was terminated.

Complaint, ¶¶ 18-27.

Defendant maintains that Plaintiff cannot make out a *prima facie* case for CEPA retaliation because she cannot establish, among other things, any law, rule, regulation, or clear mandate of public policy that St. Joseph's violated, and also because she cannot establish causation.   In response, Plaintiff contends that the "concerns" she raised, listed above, constitute whistleblowing activities, and that raising said concerns caused her adverse employment actions.   Based on the reasons that follow, this Court finds that Plaintiff's arguments are deficient at summary judgment.

19

**1. Plaintiff has Failed to Identify a Law, Rule, Regulation or Clear Mandate of Public Policy**

The first prong of a CEPA claim requires the Plaintiff to identify a statute, regulation or clear mandate of public policy that may have been violated by some conduct of St. Joseph's. This inquiry requires the Court to determine whether the Plaintiff actually believed the employer's practices were in violation of a specific law, rule or regulation at the time she allegedly raised concerns regarding those practices. *Dzwonar v. McDevitt*, 177 N.J. 452, 463 (2003). A Plaintiff thus cannot succeed on a CEPA claim unless she can demonstrate that she believed that the employer's practices were in violation of a specific law, rule or regulation at the time she raised concerns regarding those practices. *Id.* at 462; *Hitesman v. Bridgeway, Inc.*, 218 N.J. 8, 32-33 (N.J. 2014) (a CEPA plaintiff "must identify the authority that provides a standard against which the conduct of the defendant may be measured"). A certain degree of specificity is required by a Plaintiff to establish the first element of a *prima facie* CEPA claim. The New Jersey Supreme Court has stated it as follows:

> [T]hus, to present a cognizable retaliation claim based on "improper quality of patient care" under N.J.S.A. 34:19-3(a)(1) and (c)(1), or based on practices "incompatible with a clear mandate of public policy concerning the public health" under N.J.S.A. 34:19-3(c)(3), a plaintiff must present authority meeting the statutory criteria that serves as a standard for the employer's conduct. In absence of such authority, the CEPA claim fails.

*Hitesman*, 218 N.J. at 35; see also *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 558 (2013) (holding that "it is critical to identify the evidence that an aggrieved employee believes will support the CEPA recovery with care and precision. Vague and conclusory complaints . . . are not the sort of things that the Legislature intended to be protected by CEPA").

In Plaintiff's opposition papers, Plaintiff for the first time in this case attempts to identify a law, rule, or regulation that she claims she reasonably believes that St. Joseph's violated. Plaintiff references the Det Norske Veritas (DNV) Health Care Inc. website as proof that St. Joseph's is an accredited institution. First, Plaintiff's reliance on this DNV website fails because the website is not part of the competent record evidence in this case. Neither the website, nor any document relating to the DNV, was produced in discovery or referred to in any way before Plaintiff's opposition brief. Further, Plaintiff has made no attempt, before the filing of her opposition brief, to identify any rule, law or regulation she believes Defendant is violating; not when complaining about the lack of PCAs, in her Complaint or when pressed at her deposition. Therefore, there is no evidence in the record to establish that Plaintiff could have held any objectively reasonable belief that Defendant was in violation of any law, rule, regulation or mandate of public policy.

Even if this Court were to consider the DNV, Plaintiff does not establish which section of the accreditation guidelines she reasonably believes Defendant violated or how such section was violated. Instead, again, Plaintiff simply makes very broad and conclusory allegation that she was retaliated against for complaining to Nurse Manager Albus about the lack of PCAs on Regan 2. What the competent record evidence does demonstrate is the following: The "entire nursing staff," including Plaintiff, complained about the lack of PCAs on the unit. A change from the all RN unit to one with a PCA would require that the nursing staff be reduced – for every PCA on the unit, one nursing position would be eliminated. This would lead to a model that was not as "safe" as the all RN model. The nurses did not want fewer shifts available to them because a PCA was working on the floor in their place. The all RN model is safer because "the nurses are out on the floor. They're better educated and trained to see the early signs of agitation and they are able to medicate early." The statistical research demonstrates that there was better outcome with more

21

RNs on the floor, including less violence. For example, Nurse Manager Albus testified that "[o]ur violence on the floor had dropped since this model has gone in." (Def. 56.1 Stmt., ¶ 88, Albus Dep. Tr., 63). Accordingly, the record evidence in this case establishes that the complaints of Plaintiff were not based on any reasonable belief that St. Joseph's was violating any law, regulation or clear mandate of public policy.

### 2. Plaintiff Did Not Perform a Whistleblowing Activity

To establish the second element of a *prima facie* CEPA claim, Plaintiff is required to demonstrate that she engaged in a whistleblowing activity by disclosing to her supervisor her reasonably held belief of a violation of a law, rule, regulation or clear mandate of public policy. N.J.S.A. § 34:19-3(a). Under CEPA, "the dispute between employer and employee must be more than a private disagreement." *Maw v. Advanced Clinical Communications, Inc.*, 179 N.J. 439, 445 (2004). It must "have public ramifications." *Id.* "The legislative approach vis-à-vis a 'clear' mandate of public policy bespeaks a desire not to have CEPA actions evolve into arguments between employees and employers over what is, and is not, correct public policy." *Id.*

Plaintiff's complaints to hospital staff regarding the lack of a PCA are simply not whistleblowing activities. Complaints of this nature do not implicate a public harm but rather are simply of a private nature. These types of private disagreements between employer and employee are legally insufficient to support a CEPA claim. The competent record evidence demonstrates clearly that there was an ongoing private disagreement regarding the lack of a PCA on the unit and it was common for nurses to complain because they did not want to do tasks that were "custodial" in nature. (Def. 56.1 Stmt., ¶ 90). This type of disagreement does not "have public ramifications" and therefore does not support a CEPA claim. Accordingly, Plaintiff has failed to raise a genuine triable issue as to the second element of a CEPA claim.

### 3. Plaintiff is Unable to Establish a Causal Connection

As to the element of causation, New Jersey courts have held that "plaintiff can prove causation by presenting either direct evidence of retaliation or circumstantial evidence that justifies an inference of retaliation." *Zaffuto v. Wal–Mart Stores, Inc.,* 130 F. App'x 566, 569 (3d Cir. 2005); *Bocobo v. Radiology Consul. of S. Jersey, P.A*., No. 02–1697, 2005 WL 3158053, at *3–4 (D.N.J. Nov. 21, 2005).  A CEPA plaintiff can also "prove a causal connection through 'inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action . . . .' " *Dominguez v Costco Wholesale Corp.*, 356 F. App'x 611, 614 (3d Cir. 2009) (citing *Maimone v. City of Atl. City*, 188 N.J. 221 (2006)).  This is not a burden that can be met by speculation: a plaintiff must demonstrate a factual nexus between the protected activity and the retaliatory employment action. *Wheeler v. Township of Edison,* No. 06–5207, 2008 WL 1767017, at *9 (D.N.J. Apr. 15, 2008); *Hancock v. Borough of Oaklyn*, 790 A.2d 186, 194 (N.J. Super. Ct. App. Div. 2002).

Although she points to **no** particular record evidence in support of same, Plaintiff nevertheless posits that Nurse Albus "expressed retaliatory intent directly to Ms. Tinio by demanding revelation of other nurses who complained." (Pl. Opp'n Br. at 18).  Similarly, Plaintiff states—in a conclusory fashion—that "there are material inconsistencies and implausibilities surrounding plaintiff's termination." (*Id.* at 19).  But Plaintiff makes no attempt to articulate for the Court *how* any particular piece of evidence in the record serves as either direct or circumstantial evidence of retaliation as to any of Plaintiff's alleged whistleblowing activities.  Nor does Plaintiff point to any particular piece of evidence in the record—nor has the Court been able to find any— linking *any* of Plaintiff's alleged whistleblowing activities to *any* of the alleged adverse

employment actions.   Therefore, Plaintiff has failed to establish a causal link between her complaints and her termination.

### 4. Plaintiff is Unable to Establish that Defendant's Reason for Termination is Pretextual

To prove that St. Joseph's articulated reasons for terminating her employment were pretextual, Plaintiff "must demonstrate such weaknesses, implausibilities inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'"  *See Kolb v. Burns*, 320 N.J. Super. 467, 478 (App. Div. 1999) (quoting *Fuentes v. Perski*, 32 F.3d 759, 765 (3d Cir. 1994)).

The record evidence establishes that Plaintiff was not terminated for complaints about the lack of PCAs on Regan 2.  Her complaint about the lack of PCAs, occurring at least 4 months prior to the incidents which gave rise to her termination, is so temporally remote from her July 2012 termination so as not to give rise to an inference of retaliation.  *See* Section III.A., supra.

As more fully set forth above in Section III.A. and incorporated here, Plaintiff states in conclusory fashion, and without any factual support, that Defendant's proffered reason for her termination is pretextual.  There is no competent record evidence from which a reasonable jury could find that Plaintiff was terminated for any reason other than her actions on July 10, 2012 or that the stated reason for her termination was not the real reason for her termination.

**IV.    CONCLUSION**

For the reasons set forth above, Defendant's motion for summary judgment is granted.

Therefore, this case is closed.  An appropriate Order accompanies this Opinion.


DATED:  April 6, 2015


                                        s/ Jose L. Linares
                                        JOSE L. LINARES
                                        U.S. DISTRICT JUDGE